INMUNO VITAL, INC., Plaintiff,

v.

TELEMUNDO GROUP, INC., et al., Defendants.

No. 99–1876–CIV.

United States District Court, S.D. Florida, Miami Division.

Oct. 1, 2001.

Jeffrey Feldman, Feldman Gale & Weber, P.A., Miami, FL, for plaintiff.

Alan Rosenthal, Adorno & Zeder, P.A., Miami, FL, Jack Reiter, Fort Lauderdale, FL, for defendant.

### OMNIBUS ORDER

MOORE, District Judge.

This CAUSE came before the Court upon the following motions: Defendants' Motion for Leave to File Amended Answer and Affirmative Defenses (filed December 4, 2000; DE # 53); Plaintiff's Motion for Sanctions for Defendants' Violation of Mediation Order (filed February 7, 2001; DE # 83); Plaintiff's Motion in Limine to Prohibit Defendants from Presenting Evidence Relating to Defendants' Reliance on Advice of Counsel (filed March 8, 2001; DE # 112); Plaintiff's Motion to Strike Portions of Defendants' Response to Plaintiff's Motion for Summary Judgment (filed April 17, 2001; DE # 191); Plaintiff's Motion to Strike Defendants' Pleadings (filed August 10, 2001; DE # 312); Plaintiff's Supplemental Motion to Strike Defendants' Pleadings (filed August 22, 2001; DE # 322); Plaintiff's Second Supplemental Motion to Strike Defendants' Pleadings (filed September 7, 2001; DE # 346); Plaintiff's Motion to Strike Roland Hernandez as a Witness and To Strike Portions of Defendants' Motion for Summary Judgment (filed September 21, 2001; DE # 371); Plaintiff's Motion to Compel Mediation (filed September 21, 2001; DE # 363); and Plaintiff's Third Supplemental Motion to Strike Pleadings (filed September 25, 2001; DE # 393).

UPON CONSIDERATION of the Motions, Responses, Replies, and the pertinent portions of the Record, the Court enters the following Order GRANTING Plaintiff's Motions, and imposing sanctions as set forth below.

### A. Introduction

In these motions, Plaintiff portrayed a pattern of discovery abuses and violations of Court orders by Defendants that it contends warrants the imposition of sanctions. The sanctions sought by Plaintiff include the exclusion of certain testimony, the striking of portions of summary judgment motions and responses, denial of a motion to amend the answer and affirmative defenses, and finally, the striking of the pleadings and entry of default against Defendants on the issue of liability. Because the Court is convinced that Plaintiff has established a pattern of egregious and dilatory behavior on the part of Defendants and their counsel that justifies not only the imposition of the lesser sanctions sought, but also the imposition of the ultimate sanction—striking of the pleadings and entry of default as to liability—this Court has considered and decided these motions collectively, as set forth below.

### B. Brief Background of Case

This case involves Defendants' broadcast of commercials for the Nutrivida brand of the medicinal herb Cat's Claw, which featured likenesses of the actor Andres Garcia. Defendants are a family of corporate entities using the name Telemundo. Plaintiff, Inmuno Vital, is a manufacturer of a competing brand of the medicinal herb Cat's Claw, and claims that it owned the exclusive right to Garcia's endorsement of its brand of Cat's Claw. Plaintiff further claims that Defendants knew that Nutrivida's Cat's Claw commercials infringed on Plaintiff's exclusive right to Garcia's endorsement, yet continued to broadcast the commercials in spite of this knowledge. Finally, Plaintiff alleges that the infringing advertisements generated millions of dollars of sales of Nutrivida's brand of Cat's Claw, which Nutrivida shared with Defendants. Plaintiff previously sued Nutrivida and obtained a default judgment against Nutrivida for $15,000,000. After Nutrivida declared bankruptcy, Plaintiff commenced this action against Defendants. Plaintiff brought this four count action against Defendants for (1) violation of the Lanham Act, 15 U.S.C. § 1125; (2) Unauthorized Use of Name, Likeness, and Image under § 540.08 *Fla. Stat.;* (3) conspiracy; and (4) violation of Florida's Deceptive and Unfair Trade Practices Act, § 501.201, *Fla Stat. et seq.*

### C. Discovery Abuses and Violations of Court Orders by Defendants

The Defendants' discovery abuses and violations of Court orders established by Plaintiff in its numerous motions, and considered

by this Court in its decision to impose sanctions on Defendants, are described below.

### I. Defendants' Assertion of the Client–Attorney Privilege During Discovery Related To Its Attorney Advice Defense

■ On December 4, 2000, Defendants sought leave to file an amended answer and affirmative defenses that would include the defense of advise of counsel. In response to this motion, Plaintiff deposed Horace Dawson, who was the assistant general counsel to one of the Defendants and led the investigation of whether broadcasting the disputed advertisements would subject Defendants to liability. *See* Deposition Transcript of Horace Dawson ("Dawson Tr.") at 26–28, 38, 51, 71, 84, 97–98. In that deposition, counsel for Defendants allowed questions directed at the advice rendered by Dawson, but asserted the attorney client privilege with respect to questions about whether Defendants sought or received advise from *outside* counsel on the issue. *See* Dawson Tr. 38–39, 41–42, 44.

It is well-established that when a party asserts a defense, such as the advice of counsel defense, that makes an attorney's advice an issue in the litigation, that party waives the attorney client privilege. *See, e.g., Rhone–Poulenc Rorer, Inc. v. Home Indemnity Co.,* 32 F.3d 851, 863 (3d Cir.1994). In determining the scope of the waiver, the overriding consideration is fairness, or avoiding prejudice to the opposing party. *See Cox v. Administrator United States Steel & Carnegie,* 17 F.3d 1386, 1417 (11th Cir.1994) ("[C]ourts have generally not found waiver where the party attacking the privilege has not been prejudiced."); *Beneficial Franchise Co., Inc. v. Bank One, N.A.,* 2001 WL 492479, at *5 (N.D.Ill.) ("The overriding principle is one of fairness."). Therefore, in the interest of fairness, courts have been careful not to allow parties to introduce evidence of attorney-client communications favorable to the advice of counsel defense, while asserting the privilege with respect to communications that may be unfavorable to the defense. *See, e.g., Beneficial Franchise,* 2001 WL 492479, at *4 ("Having opened the door to certain privileged information in an effort to advance its cause, as a matter of fairness a party must disclose other privileged materials involving the subject matter of the disclosed communications."). Courts have noted that the privilege was "intended as a shield, not a sword." *Cox,* 17 F.3d at 1418.

Defendants assert that they complied with this rule of waiver in that they permitted Dawson to answer a wide range of questions directed at the nature of his advice to Defendants. However, this is an unfairly narrow interpretation of the waiver rule. The advice of counsel defense cannot be limited to the counsel and advice of the Defendants' choosing. Rather, when the advice of counsel defense is raised, the party raising the defense must permit discovery of any and all legal advice rendered on the disputed issue. For example, in *Beneficial Franchise,* the court noted that "a party must produce not only communications and opinions of the same attorney, but also privileged information from *other counsel* involving the same subject." *Beneficial Franchise,* 2001 WL 492479, at *4. By blocking Plaintiff's attempt to obtain discovery on the legal advice rendered from outside counsel on the disputed issue, Defendants unfairly attempted to use the privilege as a sword to bolster and protect its advice of counsel defense.

■ This result is manifestly unfair to Plaintiff, and this unfairness mandates the exclusion of any evidence about the advice Defendants received from counsel on this issue, and the denial of Defendants' motion to amend its answer to include the advice of counsel defense. Remedies less prejudicial to Defendants are not adequate. An order compelling additional discovery on this issue is not a viable option given the proximity of trial. More importantly, because Defendants have pointed to no caselaw credibly supporting its position that the waiver of the privilege is limited in the way they have argued, the Court concludes that Defendants' motivation in asserting the privilege was not the result of any good faith lack of clarity about the law on this issue. Rather, the assertion of the privilege in this context can fairly be attributed to dilatory motives, or worse.

Therefore, Defendants' Motion for Leave to File Amended Answer and Affirmative

Defenses (filed December 4, 2000; DE # 53), which sought to add the advice of counsel defense, will be DENIED. Plaintiff's Motion in Limine to Prohibit Defendants from Presenting Evidence Relating to Defendants' Reliance on Advice of Counsel (filed March 8, 2001; DE # 112) will be GRANTED. Furthermore, Defendants' unsupported assertions of privilege in Dawson's deposition will be considered in relation to Plaintiff's motions to strike Defendants' pleadings to the extent this behavior bolsters Plaintiff's portrait of Defendants' dilatory and unduly uncooperative behavior in this case. It will also be taken into consideration, however, that Defendants were not operating, at the time of the contested deposition, under a court order to allow questioning on the disputed topics.

## II. Defendants' Failure To Facilitate the Deposition of Roland Hernandez

On June 27, 2001, Defendants identified Roland Hernandez, Former President and CEO of Telemundo Group, Inc., as the person involved in the decision to continue to run the broadcasts of the subject advertisements. Plaintiff claims that the testimony of Hernandez should be excluded from the trial and his affidavits stricken from Defendants' pleadings because Defendants prevented Plaintiff from deposing Hernandez.

The identification of Hernandez was contained in a supplemental response to Plaintiff's First Set of Interrogatories. These interrogatories were sent to Defendants on September 5, 2000, yet Defendants' supplemental response, identifying Hernandez, was not sent to Plaintiff until June 27, 2001. See Plaintiff's Motion to Strike Roland Hernandez as a Witness, Ex. 4. While Defendants claim Hernandez's name and position were disclosed to Plaintiff as early as November 24, 2000, the disclosure of Hernandez's name and position cannot be equated with the subsequent and more apposite disclosure of his involvement in the decision to continue broadcasting the advertisements. Therefore, as an initial matter, the Court notes that Defendants identified Hernandez as the person responsible for the crucial decision to continue broadcasting the advertisements al-

most ten months after the interrogatory request was made, three months before the scheduled trial, and one month before the deadline for the completion of discovery.

Furthermore, it appears that once Defendants identified Hernandez, they attempted to prevent, or at least would not facilitate, his deposition. While the months and weeks preceding the scheduled trial apparently saw a flurry of attempts to schedule last minute depositions of a number of witnesses, the correspondence between the parties reflects a particular difficulty, even obstinance, in the scheduling of Hernandez's deposition. See Plaintiff's Motion to Strike Roland Hernandez as a Witness, Ex. 2, 3, and 4.

Specifically, Plaintiff requested agreement on a date for the deposition of Hernandez, along with several other witnesses, as early as June 29, 2001, which was just two days after Defendant identified Hernandez as the person responsible for the crucial decision to continue broadcasting the advertisements. See id. In that communication, Plaintiff proposed five dates in July for the deposition, and sought Defendants' agreement as to those dates. See id. On July 5, apparently having not obtained agreement from Defendants on a specific date, Plaintiff noticed Hernandez for deposition on August 2, 2001. See Plaintiff's Motion to Strike Roland Hernandez as a Witness, Ex. 3.

Subsequently, on July 31, 2001, Plaintiff's counsel sent a letter to Defendants' counsel that purported to confirm Defendants' counsel's statements earlier that day that neither Hernandez, nor counsel for Defendants, would appear at the previously noticed August 2, 2001 deposition. See Plaintiff's Motion to Strike Roland Hernandez as a Witness, Ex. 4. Furthermore, Plaintiff's letter indicated that Defendants' counsel had made the rescheduling of Hernandez's deposition contingent on this Court's granting a continuance. See id.

Defendants have neither denied nor explained the allegations in Plaintiff's July 31 letter, detailing Defendants' refusal to attend the August 2 deposition and the continuance contingency they placed on the scheduling of the deposition. Defendants do claim that they immediately notified Plaintiff that Au-

gust 2 was unacceptable, but they do not indicate why it was unacceptable, or provide any supporting documentation. This unsupported assertion is problematic because it is belied by Plaintiff counsel's July 31 letter, indicating that Defendants did not notify Plaintiff that they would not be attending the deposition until earlier that day. Furthermore, while Defendants complain that the August 2 deposition date was unilaterally noticed and not coordinated, Plaintiff, as dis-. cussed above, has shown that it attempted, as early as June 29, to agree upon a date for Hernandez's deposition. *See* Plaintiff's Motion to Strike Roland Hernandez as a Witness, Ex. 3. Moreover, Defendants' interest in making the deposition of Hernandez contingent on this Court's granting a continuance, which remains unrefuted, is of questionable motive.

Notably, the correspondence between the parties reveals that Defendants finally agreed to a September 11, 2001 date for Hernandez's deposition, and that counsel flew from Miami to Los Angeles for the deposition. The deposition was ultimately cancelled due to terrorist attacks that occurred in New York City and Washington D.C. on September 11. However, while the parties remained in Los Angeles for four more days due to the ensuing cancellation of all private air travel, the deposition of Hernandez still did not occur. Defendants informed Plaintiff that Hernandez was unavailable to be deposed on September 12, September 13, September 14, and September 15, because he was required to assume responsibilities for supervising a family company that provides security for United States personnel and facilities around the world. There is now insufficient time before trial for the parties to travel back to Los Angeles to take the live deposition of Hernandez.

This Court has been provided no documentation supporting or refuting this last family business conflict on the part of Hernandez, and therefore makes no finding as to its genuineness. Rather, the Court notes that if Defendants truly did not have control over Hernandez, as they claim, they should have identified him earlier and been more cooper-

ative in the scheduling of earlier deposition dates. Having belatedly identified Hernandez and rebuffed a number of attempts by Plaintiff to schedule an earlier deposition, Defendants are the parties best suited to bear the risk that the eleventh hour deposition would not occur. Therefore, that deposition having not occurred, Defendants will not be permitted to glean an unfair advantage over Plaintiff by relying on this witness to whom Plaintiff did not have access during discovery.

■ The Federal Rules of Civil Procedure allows the imposition of sanctions against a party when an "officer, director, or managing agent of [that] party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of [that] party fails … to appear before the officer who is to take the deposition, after being served with a proper notice." Fed.R.Civ.P. 37(d). A "previous directive order is not a prerequisite" to the imposition of sanctions under Fed.R.Civ.P. 37(d). *Hall v. Leon County Building Supply Company, Inc.*, 84 F.R.D. 372 (N.D.Fla.1979). In addition, courts have stricken affidavit testimony where a party gives affidavit testimony but refuses to allow deposition questioning to test the veracity of the affidavit. *See U.S. v. One Parcel of Real Property Commonly Known as 901 N.E. Lakewood Dr., Newport, Oregon,* 780 F.Supp. 715, 720–22 (D.Or.1991) (striking affidavits because affiants asserted Fifth Amendment privilege).

A sanction less severe than excluding and striking Hernandez's testimony would not be adequate to protect Plaintiff. Plaintiff's ability to engage in an effective cross-examination of Hernandez at trial would be unfairly curbed without the advantage of having deposed him beforehand. In addition, while Defendants recently unilaterally noticed a video deposition of Hernandez for September 28, 2001, this option is also inadequate to protect Plaintiff for two reasons. First, given the proximity of trial and the fact that several other depositions have already been set for the week proceeding trial, Plaintiff asserts that it does not have time to depose Hernandez. Second, Plaintiff contends that a video deposition is unacceptable because of the difficulties in examining

documents when depositions are not taken in person. These objections are reasonable in light of Plaintiff's many earlier attempts to schedule Hernandez's live deposition, and for these reasons, this Court quashed the Notice on September 27, 2001.

Finally, the Court notes that this situation is clearly not comparable to *Brooks v. United States*, 837 F.2d 958 (11th Cir.1988), in which the Eleventh Circuit found that it was an abuse of discretion to strike a witness for the plaintiff where "there are no findings that plaintiff did anything wrong and no explanation of why the court took the action it did, and at every stage the plaintiff was given no opportunity to even contradict the defendant's assertions of what he was said to have done." *Id.* at 963. To the contrary, here Plaintiff has enumerated instances of Defendants' delay and obstinance in scheduling this deposition, and Defendants have been given a chance, in both a response and a supplemental response, to explain this lack of cooperation, and have not done so to the Court's satisfaction.

Accordingly, Plaintiff's Motion to Strike Roland Hernandez as a Witness and To Strike Portions of Defendants' Motion for Summary Judgment (filed September 21, 2001; DE # 371) will be GRANTED. Furthermore, Defendants' delay in identifying and scheduling a deposition for Hernandez will be considered in relation to Plaintiff's motions to strike Defendants' pleadings to the extent that this behavior bolsters Plaintiff's portrait of Defendants' dilatory and unduly uncooperative behavior in this case. It will also be taken into consideration, however, that Defendants were not operating, at the time of the scheduling arguments, under a court order to allow the deposition of Hernandez.

### III. Defendants' Violation of this Court's Mediation Orders

█ Plaintiff has also moved to compel mediation, and twice sought sanctions for Defendants' violation of this Court's mediation orders. The short and unnecessarily cantankerous history of the parties' mediation attempts in this case follows. This Court has entered several scheduling orders, all of which directed that mediation be completed no later than sixty days prior to the scheduled trial date. *See, e.g.,* Docket Entry 7. Pursuant to these orders, and upon the parties' request, the Court entered an order scheduling mediation for January 29, 2001.

On January 16, 2001, shortly before the scheduled mediation, Defendants requested permission for its Missouri insurance adjuster, who was the person with the authority to settle the case, to appear telephonically rather than appearing in person. The Court denied that request, citing its December 2, 1999 Order requiring the "appearance of counsel and each party or representative of each party with full authority to enter in a full and complete compromise and settlement." *See* Docket Entry 73. The Court noted that the appropriate solution to the insurance adjuster's scheduling conflict would be to reschedule the mediation. *See id.*

However, instead of requesting that the Court reschedule the mediation, Defendants attended the mediation with a local, independent adjuster. The parties did not complete mediation, and Plaintiff sought sanctions. Plaintiff claimed that the local adjuster did not have the full authority to settle, which breached the Court's order and caused Plaintiff to waste time and resources preparing for mediation. In response, Defendants argued that the insurance company retained a local adjuster to appear on behalf of the Missouri adjuster and delegated to that adjuster the necessary authority. In addition, Defendants contended that the Missouri adjuster was available by telephone.

After this first failed mediation, the parties did not genuinely attempt to schedule another mediation until nearly the deadline to complete mediation. While Plaintiff tries to argue that Defendants refused to engage in further mediation after the first failed mediation, the evidence on the record indicates that Plaintiff did not request another mediation until late July 2001. In response to that request, Defendants mouthed a willingness to mediate in theory, but hedged on the specifics. *See* Plaintiff's Motion to Compel Mediation, Ex. 3. Specifically, in a responsive letter to Plaintiff's counsel's July letter requesting

mediation, Defendants raised the truly baffling argument that Plaintiff should have first suggested dates for mediation. *See id.* Why Defendants were unable to suggest dates for mediation themselves is not explained. In addition, Defendants objected to the proposed second mediation on the grounds that Plaintiff doubled its settlement demand after the first mediation. *See id.* However, increasing a settlement demand can hardly be considered bad faith in light of the fact that seven additional months of vigorous and expensive litigation had transpired between the first mediation and the next mediation request, and significantly more discovery had been obtained. Regardless, a distaste for Plaintiff's initial demand can hardly be considered grounds for not mediating in violation of a Court order.

Once this Court denied the most recent motion for continuance and Plaintiff moved to compel mediation, the parties did agree that mediation should occur, and simply disagreed as to the appropriate date. Plaintiff preferred September 25, whereas Defendants preferred October 3 and 4. After a pretrial conference was held in this case, and the undersigned admonished Defendants for their delay in mediating, Defendants conceded to the September 25 date, and a mediation occurred. However, rather than resulting in a settlement, or even an amicable discussion of compromise, that mediation resulted in Plaintiff filing a third motion to strike Defendants' pleadings. Plaintiff again objected that Defendants failed to appear with an adjuster authorized to settle the case, and Defendants again responded that the local adjuster present did have full authority to settle.

Defendants' assertions that full authority to settle was given to the adjusters who attended the first and, to a lesser extent, the second mediation conferences are unconvincing for several reasons. First, Defendants' assertion that the adjusters were given full authority to settle is not supported by affidavit or any other documentation. Second, with respect to the first mediation, the local adjuster's authority is belied by Defendants' initial request to the Court that the Missouri adjuster be permitted to appear telephonically in order to comply with the Court's requirement that the party with full authority to settle be present. Third, with respect to the first mediation, the Court specifically expressed an openness to rescheduling the mediation to permit the Missouri adjuster to attend in person, but Defendants did not ask the Court to reschedule. Fourth, Defendants' strong reliance in defending the first motion on the Missouri adjuster's availability by telephone directly ignores this Court's explicit finding that appearance by telephone does not satisfy the Court's mediation order.

Therefore, with respect to the first mediation, monetary sanctions of fees and costs will be awarded to Plaintiff for Defendants' failure to comply with this Court's mediation order. The Court's mediation order entered in this case clearly states: "The Court may impose sanctions against parties and/or counsel who do not comply with the attendance or settlement authority requirements herein or who otherwise violate the terms of this Order." *See* Docket Entry 6. Monetary sanctions will not be entered with respect to the second mediation because, when the date was selected, it was presumably too late for the out-of-town adjuster to be flown to Miami.

Regardless of what monetary sanctions should be imposed as a result of this violation, these mediation disputes, *standing alone*, do not warrant striking of Defendants' pleadings, as requested by Plaintiff. Plaintiff's requests to mediate, followed by a motion to compel mediation, simply occurred too late to justify this sanction on this basis alone, even though the record evidence shows that Defendants were less than cooperative in response to Plaintiff's request. Furthermore, Defendants' use of a local adjuster instead of the originally designated Missouri adjuster, while sufficiently questionable to warrant monetary sanctions, is not so egregious as to warrant a default judgment. Therefore, Plaintiff's Third Supplemental Motion to Strike Pleadings will be denied. However, the instances of Defendants' refusal to cooperate to comply with Court mediation orders does bolster Plaintiff's portrait of Defendants' dilatory and unduly uncooperative behavior in this case, and may be consid-

ered to that extent in relation to the other motions to strike.

In summary, Plaintiff's Motion for Sanctions for Defendants' Violation of Mediation Order (filed February 7, 2001; DE # 83) will be GRANTED. Decision on the amount of these sanctions will be reserved for later determination as there is no evidence on the record as to the amount of fees and costs. Plaintiff's Third Supplemental Motion to Strike Pleadings (filed September 25, 2001; DE # 393) will be DENIED. And finally, Plaintiff's Motion to Compel Mediation (filed September 21, 2001; DE # 363) will be DENIED as moot in light of the Court's rulings on the below motions.

### V. Defendants' Violation of this Court's Discovery Orders

Plaintiff has also filed three motions addressing Defendants' violations of Court orders compelling production of documents, and asking for more severe sanctions than those granted above. The motions directed at document production violations are Plaintiff's Motion to Strike Defendants' Pleadings (filed August 10, 2001; DE # 312); Plaintiff's Supplemental Motion to Strike Defendants' Pleadings (filed August 22, 2001; DE # 322); and Plaintiff's Second Supplemental Motion to Strike Defendants' Pleadings (filed September 7, 2001; DE # 346). Plaintiff's complaints are aimed primarily at Defendants' failure to produce certain contracts of sale of advertisement time, certain program logs detailing what commercials were aired and when they were aired, and certain contracts between Andres Garcia, the actor whose endorsement was the subject of the dispute, and Defendants. Defendants do not deny that they have not produced these documents, but have offered a variety of excuses for this failure. The sequence of events leading to these disputes, from which this Court will determine the severity of the violations, is chronicled below.

#### a. The Contracts for Sale and the Program Logs

On December 10, 1999, Plaintiff served its first Request for Production on Defendants. In that Request, Plaintiff sought production of all contracts between Defendants and Nutrivida and all documents and logs relating to the airing of the infringing advertisements at issue in this case. Defendants objected to the Request, and Plaintiff moved to compel. On June 8, 2000, the Honorable John J. O'Sullivan, United States Magistrate Judge, entered an order directing Defendants to produce, on or before June 28, 2000, any and all documents in their control (1) with respect to any paid programming paid for by Nutrivida relating to Cat's Claw; (2) relating to Inmuno's Cat's Claw products; and (3) relating to Telemundo's relationship with and its dealings with Nutrivida as to matters involving Cat's Claw. See Court Order (entered June 8, 2000; DE # 25).

On September 13, 2000, Plaintiff served its First Set of Interrogatories on Defendants. Interrogatory 7 asked Defendants to identify each infringing advertisement and information regarding where each infringing advertisement ran, when it ran, and the remuneration Defendants received for the broadcast. In response, Defendants simply referred Plaintiff to previously produced documents, which caused the Magistrate Judge to enter an Order directing Defendants to provide "full and complete" answers to the interrogatories posed, including Interrogatory 7. However, in the face of this Order, Defendants again referenced documents previously produced, 325 of which were illegible. Plaintiff again moved to compel, and, the Magistrate Judge again ordered Defendants to respond appropriately to Interrogatory 7. See August 27, 2001 Order. Specifically, the Magistrate Judge ordered Defendants to "[s]pecify the category and location of those records which contain the responses to each of the questions raised in Interrogatory 7 or provide a written response to those questions or, if Telemundo is unable to do either of the aforementioned, Telemundo shall specify, in writing the efforts it undertook to ascertain the answers to the questions." Id.

In spite of these Court orders, Plaintiff contends, and Defendants concede, that Plaintiff received neither Defendants' contracts of sale for commercial air time, nor program logs detailing exactly what advertisements were aired and when they were aired. Furthermore, Defendants' proffered

justification for their failure to produce these documents has fluctuated over the course of this litigation, thus casting doubt on the credibility of the reasons offered. Initially, at a June 29, 2001 hearing before the Magistrate Judge, counsel for Defendants represented to the Magistrate Judge that he understood the scope of the Court's Order, and that Defendants had complied with it. Specifically, he stated: "They came in on a motion to compel, and Your Honor ordered us to go back and give them *every piece of paper,* answer the question about when these broadcasts took place. *We have done that.* We have provided the documents." Plaintiff's Supplemental Motion To Strike, Ex. A, at 8 (emphasis added).

In addition, at the same hearing, counsel for Defendants represented to the Magistrate Judge that the contracts for sale, which he referred to as "traffic instructions," and program logs had not been kept, and that Plaintiff had all the documents Defendants had. *See* Plaintiff's Supplemental Motion To Strike, Ex. A, at 13. Specifically, counsel for Defendants said:

> There at some time would have been other documents called traffic instructions, where an advertiser sends an instruction to a television station or a network what ads to put on during what schedule. Then there are computer entries. Those computer entries all end up on the invoices that have been provided. *The traffic instructions and all the other stuff is gone. We don't keep it. So they have everything we have.*

*See* Plaintiff's Supplemental Motion To Strike, Ex. A, at 13 (emphasis added).

However, at a deposition on August 6, 2001, just several weeks later, an employee of Defendants revealed that the contracts of sale and program logs had been maintained. *See* Plaintiff's Supplemental Motion To Strike, Ex. B. At that point, counsel for Defendants stated that the contracts "may in fact exist" and that the program logs existed, but that they were not produced because they were redundant to the invoices already produced and physically impossible to gather. *See id.* at 5, 8–9, 11. This statement directly conflicts with his representation before the

Magistrate Judge that the program logs and contracts of sale no longer existed, and that Plaintiff had received every document in the possession of Defendants.

Furthermore, Defendants' unilateral and initially secret decision not to produce the sales contracts and program logs directly violates the Magistrate Judge's June 8, 2000 Order directing Defendants to produce any and all documents in their control relating to Defendants' relationship with and its dealings with Nutrivida as to matters involving Cat's Claw. Defendants of course were free to move for a protective order or for clarification of the Order that was entered, but they did not. Instead, Defendants denied the existence of the program logs and sales contracts until the existence of the contracts was exposed during the August 6 deposition, and then, once the existence was exposed, raised the argument that the documents are redundant and unduly burdensome. *See* Plaintiff's Supplemental Motion To Strike, Ex. B, at 4, 10. Notably, the August 6 deposition, during which Plaintiff first became aware of the existence of the documents, was only two months before the scheduled trial.

### b. Agreement Between Garcia and Defendants

Plaintiff has also taken issue with Defendants' failure to produce a certain letter agreement between Andres Garcia and Defendants. Specifically, the agreement related to a Spanish language soap opera in which Garcia appeared. The agreement provided: "Telemundo will not broadcast any commercial featuring 'Una De Gato' [Cat's Claw] during the network commercial breaks within the novela without the consent of Andres Garcia." Plaintiff's Second Supplemental Motion to Strike, Ex. C.

Plaintiff claims that this contract is highly relevant to discrediting Defendant's innocent infringer defense. Specifically, Plaintiff argues that this letter agreement speaks to "Telemundo's state of mind when it continued to air the infringing advertisements despite Garcia's lack of consent," and therefore supports its argument that Defendants were not simply "innocent infringers." *See* Plain-

tiff's Second Supplemental Motion To Strike. On the other hand, Defendants assert that such provisions are standard in all similar programming acquisitions, and that their purpose is to avoid audience confusion between the character played by the actor in a program and a commercial featuring the actor in his real life persona. *See* Defendants' Response to Plaintiff's Second Supplemental Motion to Strike. Regardless of which party is ultimately correct, it is important to note that these arguments are, most fundamentally, *jury* arguments. Defendants' unilateral assertion that this agreement does not discredit its innocent infringer defense, and therefore that it did not have to be disclosed, flies in the face of our legal system's liberal rules of discovery, as well as the Magistrate Judge's discovery orders.

The letter agreement was clearly encompassed within the Magistrate Judge's June 8, 2001 discovery order. That Order directed Defendants to produce "any and all documents ... relating to Garcia and any type of Cat's Claw" and "any and all documents ... relating to Nutrivida's Cat's Claw and Garcia." *See* Plaintiff's Second Supplemental Motion To Strike Telemundo's Pleadings, Ex. A. As with the program logs and the contracts of sale, Defendants limited their production of documents in response to this Order to those it supposedly found, in its own estimation, to be helpful to Plaintiff's case, irrespective of whether the documents fell within the letter of this Court's discovery orders. However, Plaintiff should be the final arbiter of what documents are helpful to its case, and Defendants' *only* duty was to produce those documents that were encompassed within Plaintiff's requests or the Court's discovery orders. Defendants have clearly breached this duty, and in so doing, have stymied not only Plaintiff's access to discoverable documents, but also the efficient functioning of the adversarial process in this litigation.

### c. Selecting an Appropriate Sanction for the Discovery Violations

■ Having found that Defendants violated discovery orders on several occasions, the Court turns to the issue of what sanction is appropriate to protect Plaintiff and punish

Defendants' violations. Plaintiff contends that the only adequate sanction for these violations would be to strike Defendants' pleadings and enter default judgment against Defendants on the liability issue. Rule 37(b)(2) of the Federal Rules of Civil Procedure provides that if a party fails to obey an order to provide or permit discovery, "the court ... may make such orders in regard to the failure as are just," and one order listed as permissible is "an order striking out pleadings ... or rendering a judgment by default against the disobedient party." Fed. R.Civ.P. 37(b)(2)(C). However, unlike lesser sanctions, imposition of a default judgment sanction requires that the district court first find (1) that the party exhibited a willful or bad faith failure to obey a discovery order; (2) that the moving party was prejudiced by that violation; and (3) that a lesser sanction would fail to punish the violation adequately and would not ensure future compliance with court orders. *See Malautea v. Suzuki Motor Company, Ltd.*, 987 F.2d 1536, 1542 (11th Cir.1993); *BankAtlantic v. Blythe Eastman Paine Webber*, 12 F.3d 1045, 1048–50 (11th Cir.1994); *R.M. Phillips v. Insurance Company of North America*, 633 F.2d 1165 (5th Cir.1981); *Snow v. Bellamy Mfg. & Repair*, 1995 WL 902210, at *2 (N.D.Ga.). Therefore, the Court must consider whether these prerequisites have been satisfied in this case before imposing the sanctions sought by Plaintiff.

### 1. Willfulness of Defendants

■ It is well-established that violation of a discovery order by simple negligence, misunderstanding, or inability to comply will not justify the sanction of default. *See Malautea*, 987 F.2d at 1542. Rather, "a default judgment sanction requires a willful or bad faith failure to obey a discovery order." *Id.* The Court finds that there is sufficient evidence on the record to show that Defendants' failure to comply was willful. The disputed documents were clearly encompassed within the discovery orders, and the Defendants have not provided any credible explanation of how they could have interpreted the discovery orders differently. Rather, Defendants maintained that the contracts of sale did not

exist until a deposition of one of their employees contradicted this position. When this occurred, Defendants changed their story, and argued that the documents were not produced because they were redundant and unduly burdensome.

Defendants have been given an opportunity to explain this sudden change in their position on the existence of the documents, and have not done so. Furthermore, even when Plaintiff made strikingly clear its interest in the documents, and its intention to seek sanctions if the documents were not produced, Defendants were undeterred and persisted in their refusal to produce the documents. Finally, as discussed, Defendants never asked that the production Order be clarified, and never sought a protective order. Rather, they unilaterally narrowed the scope of the discovery order, and initially did so secretly.

In *Malautea*, the Eleventh Circuit determined that similar behavior by the sanctioned party was sufficient to support a finding of willfulness. *Malautea*, 987 F.2d at 1543. Specifically, that court noted:

> Neither defendant has provided a credible explanation of how it interpreted the discovery orders not to encompass the General Motors information. Neither defendant asked Judge Edenfield to clarify the orders, as a genuinely confused litigant, twice-threatened with the sanction of a default judgment, would have done. In particular, the defendants never asked Judge Edenfield to explain whether the orders covered the plaintiff's interrogatory that requested the General Motions information.

*Id.* This behavior is similar to the behavior of Defendants in this case, except that this Court did not previously threaten the sanction of default.

Nonetheless, Defendants were certainly on notice of the possibility of this sanction as a result of Plaintiff's reaction when the existence of the documents was exposed at the August 6 deposition, and the barrage of motions to strike that followed. Still, however, Defendants did not allow Plaintiff to inspect the documents, nor did Defendants seek clarification or a protective order for the disputed documents. In *R.M. Phillips v. Insurance Company of North America*, 633 F.2d 1165 (5th Cir.1981), where a party was seriously warned by the opposing party of their intention to seek sanctions, as occurred here, the court found that this warning put the party on notice, and that the party could not later plead ignorance. *Id.* The Fifth Circuit appositely noted:

> Appellant twice rejected attempts by appellee's counsel to resolve the discovery problem informally. Any belief held by appellant that he had completely discharged his obligation under the order compelling discovery would have dissipated upon receipt of defense counsel's letter of November 8, 1979. If not, then defense counsel's letter of December 5, which threatened Rule 37 action in unequivocal language, should have inspired an appellant so imbued with good faith as this one claims to have been to consult the district court for direction or respond to opposing counsel for negotiation.

The warnings issued by Plaintiff in this case are markedly similar, and were also sufficient to put Defendants on notice that its compliance with the discovery order was questionable. When the existence of the documents was exposed during the August 6 deposition, Plaintiff immediately demanded that Defendants produce the documents. An argument ensued, and Plaintiff requested excerpts of the argument from the court reporter, for use in the motion he told Defendants he would be filing. Defendants remained unpersuaded, and Plaintiff filed the motion now before the Court. Plaintiff's persistent demands for the documents, and subsequent motions to strike, put Defendants on notice that they had not complied with Court orders, and cured them of any ignorance they might have previously harbored. Therefore, a finding of willfulness on the part of Defendants is supported by the record.

Notably, Defendants have also defended against the motions to strike by pointing out that Plaintiff delayed in pursuing this case. Defendants claim that the discovery problems were caused by Plaintiff's procrastination. While it may be true that discovery got

off to a slow start in this case, Plaintiff's initial delay does not excuse Defendants' delay and noncompliance once the case was brought, once discovery requests were made, and once Court orders were entered. Therefore, Plaintiff's initial delay does not negate Defendants' subsequent willful transgressions of the discovery process.

### 2. Prejudice to Plaintiff

Furthermore, it appears that Plaintiff was seriously prejudiced by Defendants' failure to produce the disputed documents. Notably, it is impossible to know how helpful the documents would have been to Plaintiff because Defendants have not permitted Plaintiff to inspect the documents. Rather, with respect to the program logs and contracts of sale, Defendants submitted an affidavit which indicates that the information in those documents is identical to the information in the invoices already produced to Plaintiff. However, to rely on this affidavit to conclude that Plaintiff was not prejudiced when Plaintiff has not even had an opportunity to inspect the documents would deny Plaintiff the protections inherent in our adversarial system. Moreover, even if the information in the documents was redundant, the information may have been more legible or more clearly organized than it was in the documents that were produced. If so, Plaintiff and its experts may have been spared the substantial time and considerable resources spent deducing the same information from the invoices that were produced. *See* Plaintiff's Motion to Strike, at 12. Notably, however, we will never know because Defendants falsely denied the existence of the documents, and then denied Plaintiff access to them. Therefore, any uncertainty about what was in the documents must be construed against Defendants. This leads to the inevitable conclusion that Plaintiff was prejudiced.

However, the prejudice to Plaintiff is not only presumed; there is also actual evidence of prejudice. Because of the late revelation of the existence of the program logs, the contracts of sale, and the contract giving Garcia a right to refuse the airing of the ads during his programs, Plaintiff was also denied the opportunity to depose Defendants' witnesses about these documents. There-

fore, even if Defendants had been again ordered to produce the documents in these weeks proceeding the trial, and had done so, Plaintiff's ability to use the documents effectively at trial would have been significantly diminished.

A finding of prejudice is an important component of a decision to sanction a party with dismissal or default. For example, in *Snow v. Bellamy Mfg. & Repair*, 1995 WL 902210 (N.D.Ga.), a district court found that the sanction of default was not appropriate, even though the violation was willful, because the plaintiff had not shown that it was prejudiced. *Id.* at 2. Having found that Plaintiff in this case was prejudiced, as discussed above, the Court turns next to the issue of whether a lesser sanction would adequately cure that prejudice and ensure future compliance with Court orders.

### 3. Availability of Lesser Sanctions

The sanction of striking the pleadings and granting default judgment is a sanction of "last resort" and is appropriate only where lesser sanctions are not adequate. *Malautea*, 987 F.2d 1536, 1542. However, it is also true that "overleniency is to be avoided where it results in inadequate protection of discovery." *In re Liquid Carbonic Truck Drivers Chemical Poisoning Litigation*, 580 F.2d 819, 823 (5th Cir.1978). In this case, Defendants' repeated dilatory tactics, chronicled in the above sections, in addition to the discovery violations addressed in this section, has seriously impacted Plaintiff's ability to prepare effectively for trial.

A lesser sanction that would cure this prejudice is not readily apparent. While yet another continuance of this action might allow the parties to exchange the previously withheld discovery and conduct depositions on that discovery, a continuance is simply not a viable option. Five continuances have been granted in this matter already. A sixth continuance would have inappropriately rewarded Defendants for the dilatory tactics described above. *See Goforth v. Owens, M.D.*, 766 F.2d 1533, 1535 (11th Cir.1985) (finding continuance was not appropriate to cure prejudice because it would have punished the non-offending party).

In addition, some courts have decided to instruct the jury as to negative inferences that should be drawn from violation of discovery orders, in lieu of striking the infracting party's pleadings. However, courts and commentators have noted that "adverse inference instructions are one of the least severe sanctions which the court can impose and, therefore, often have very little deterrent effect." *Mosel Vitelic Corp. v. Micron Technology, Inc.,* 2001 WL 520829, at *7 (D.Del.). In the case at bar, it is not entirely clear from the pleadings what the jury would have to infer in order to cure the prejudice suffered by Plaintiff, as Defendants' delay and noncompliance appears to have permeated so many areas of trial preparation.

As a final matter, it is important to note that, in selecting a sanction, a court should not punish the client when it was the attorney that was responsible for the violations. For example, in *Gratton v. Great American Communications,* 178 F.3d 1373, 1375 (11th Cir.1999), the court noted that "a court should be reluctant to impose the harsh sanction of dismissal with prejudice where the plaintiff is not actually culpable...." *Id.* at 1375. However, in that case the court found that the harsh sanction was appropriate because no other sanction would cure the harm, and because the client was substantially responsible for the delays. *Id.* In the case at bar, there is indication that the delays and discovery violations were attributable to Defendants themselves, in addition to their counsel. In fact, it appears that Defendants' in house counsel has also been substantially involved in the litigation. Furthermore, it was Defendants' officers and managers that would have known of the existence of the documents that were not produced, and known that their content was encompassed in the Court orders. Therefore, in this case, the imposition of sanctions would not unfairly prejudice Defendants for the conduct of their counsel.

In summary, because this Court has found (1) that Defendants exhibited a willful failure to obey discovery orders entered in the case; (2) that Plaintiff was prejudiced by that violation; and (3) that a lesser sanction would fail to protect the Plaintiff, would not punish the violation adequately, and would not ensure future compliance with court orders, the Court concludes that the appropriate sanction is to strike Defendants' pleadings and grant Plaintiff a default judgment as to liability. *See Malautea,* 987 F.2d at 1542; *BankAtlantic,* 12 F.3d at 1048–50; *R.M. Phillips,* 633 F.2d 1165; *Snow,* 1995 WL 902210 at *2. Accordingly, Plaintiff's Motion to Strike Defendants' Pleadings (filed August 10, 2001; DE # 312) will be GRANTED; Plaintiff's Supplemental Motion to Strike Defendants' Pleadings (filed August 22, 2001; DE # 322) will be GRANTED; and Plaintiff's Second Supplemental Motion to Strike Defendants' Pleadings (filed September 7, 2001; DE # 346) will be GRANTED.

## V. CONCLUSION

Accordingly, after considering the Motions, the responses and replies, and the other pertinent portions of the record, it is

ORDERED AND ADJUDGED as follows:

1. Defendants' Motion for Leave to File Amended Answer and Affirmative Defenses (filed December 4, 2000; DE # 53) is DENIED.

2. Plaintiff's Motion for Sanctions for Defendants' Violation of Mediation Order (filed February 7, 2001; DE # 83) is GRANTED. Decision on the amount of the monetary sanctions will be reserved for later determination.

3. Plaintiff's Motion in Limine to Prohibit Defendants from Presenting Evidence Relating to Defendants' Reliance on Advice of Counsel (filed March 8, 2001; DE # 112) is GRANTED.

4. Plaintiff's Motion to Strike Portions of Defendants' Response to Plaintiff's Motion for Summary Judgment (filed April 17, 2001; DE # 191) is DENIED as moot.

5. Plaintiff's Motion to Strike Defendants' Pleadings (filed August 10, 2001; DE # 312) is GRANTED.

6. Plaintiff's Supplemental Motion to Strike Defendants' Pleadings (filed August 22, 2001; DE # 322) is GRANTED.

7. Plaintiff's Second Supplemental Motion to Strike Defendants' Pleadings (filed September 7, 2001; DE # 346) is GRANTED.

8. Plaintiff's Motion to Strike Roland Hernandez as a Witness and To Strike Portions of Defendants' Motion for Summary Judgment (filed September 21, 2001; DE # 371) is GRANTED.

9. Plaintiff's Motion to Compel Mediation (filed September 21, 2001; DE # 363) is DENIED as moot.

10. Plaintiff's Third Supplemental Motion to Strike Pleadings (filed September 25, 2001; DE # 393) is DENIED.